# 16-0305-cv

## United States Court of Appeals

### for the

## Second Circuit

ABBEY HOUSE MEDIA, INC., DBA BooksOnBoard,

*Plaintiff-Counter-Defendant-Appellant,*

– v. –

SIMON & SCHUSTER, INC., PENGUIN GROUP (USA) LLC,
the successor to the named Defendant The Penguin Group,

*Defendants-Counter-Claimants-Appellees,*

HACHETTE BOOK GROUP, INC., HARPER COLLINS PUBLISHERS,
L.L.C., VERLAGSGRUPPE GEORG VON HOLTZBRINCK GMBH,
HOLTZBRINCK PUBLISHERS, L.L.C., DBA Macmillan,
THE PENGUIN GROUP, a division of Pearson PLC,

*Defendants-Appellees,*

APPLE INC.,

*Defendant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REDACTED BRIEF FOR DEFENDANTS-COUNTER-CLAIMANTS-APPELLEES AND DEFENDANTS-APPELLEES

SAUL P. MORGENSTERN
MARGARET A. ROGERS
ALICE C.C. HULING
KAYE SCHOLER LLP
*Attorneys for Defendant-Counter-Claimant-Appellee Penguin Group (USA) LLC*
250 West 55th Street
New York, New York 10019
(212) 836-8000

JAMES W. QUINN
YEHUDAH L. BUCHWEITZ
GREGORY SILBERT
WEIL, GOTSHAL & MANGES LLP
*Attorneys for Defendant-Counter-Claimant-Appellee Simon & Schuster, Inc.*
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*(For Continuation of Appearances See Inside Cover)*

LINDA H. MARTIN
SAMUEL J. RUBIN
FRESHFIELDS BRUCKHAUS
    DERINGER US LLP
*Attorneys for Defendant-Appellee*
    *Hachette Book Group, Inc.*
601 Lexington Avenue, 31st Floor
New York, New York 10022
(212) 277-4000

C. SCOTT LENT
ARNOLD & PORTER LLP
*Attorney for Defendant-Appellee*
    *HarperCollins Publishers L.L.C.*
399 Park Avenue
New York, New York 10022
(212) 715-1000

JOEL M. MITNICK
JOHN J. LAVELLE
BIANCA CADENA
SIDLEY AUSTIN LLP
*Attorneys for Defendant-Appellees*
    *Holtzbrinck Publishers, LLC, DBA*
    *Macmillan and Verlagsgruppe*
    *Georg Von Holtzbrinck GMBH*
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellees state the following:

Simon & Schuster, Inc.: Simon & Schuster, Inc.'s direct and indirect parent entities are:  French Street Management LLC, CBS Operations Inc. and CBS Corporation.

CBS Corporation is a publicly traded company.  National Amusements, Inc., a privately held company, beneficially owns the majority of the Class A voting stock of CBS Corporation.  Otherwise, with respect to ownership of the Class A voting stock of CBS Corporation in the amount of 10% or more, CBS Corporation is only aware, without inquiry, of the following information based upon filings made pursuant to Section 13(d) or Section 13(g) of the Securities and Exchange Act of 1934, as amended: according to a Schedule 13D/A, dated February 25, 2011 and filed with the Securities and Exchange Commission on March 15, 2011, GAMCO Investors, Inc., along with certain entities and persons affiliated therewith (any of which may be publicly held), held shares representing, as of February 28, 2015, approximately 11.7% of CBS Corporation's Class A voting stock, based on such Schedule 13D/A.

HarperCollins Publishers L.L.C.:  HarperCollins Publishers L.L.C. hereby states that News Corporation, a publicly held company, is the ultimate parent

corporation of HarperCollins. No publicly-held company owns 10% or more of News Corporation's stock.

Holtzbrinck Publishers, LLC and Verlagsgruppe Georg Von Holtzbrinck GmbH: Holtzbrinck Publishers, LLC has no subsidiaries, and its ultimate corporate parent entity is a German company called Georg Von Holtzbrinck GmbH & Co. KG. There are no publicly held companies in the chain of ownership between Holtzbrinck Publishers, LLC and its ultimate parent entity. Although Holtzbrinck Publishers, LLC has affiliate entities in the United States and around the world, none of these is a publicly held company with ownership interests or control with respect to Holtzbrinck Publishers, LLC.

Verlagsgruppe Georg Von Holtzbrinck GmbH is a privately owned German company with no ultimate corporate parent. Although Verlagsgruppe Georg Von Holtzbrinck GmbH has subsidiary and affiliate entities in the United States and around the world, none of these is a publicly held company with ownership interests or control with respect to Verlagsgruppe Georg Von Holtzbrinck GmbH.

Penguin Random House LLC: Penguin Random House LLC, the successor to the named party The Penguin Group, is a (i) non-governmental corporate party and (ii) a limited liability company in which membership interests are owned 53 percent by Bertelsmann SE & Co. KGaA, a German Corporation, and 47 percent

by Pearson PLC, a U.K. publicly held company whose shares are traded on the London Stock Exchange and the New York Stock Exchange.

 <u>Hachette Book Group, Inc.</u>: Hachette Book Group, Inc. is a wholly-owned subsidiary of Hachette Livre USA, Inc.; Hachette Livre USA, Inc. is a wholly-owned subsidiary of Lagardère North America Inc.; Lagardère North America Inc. is a wholly-owned subsidiary of Lagardère Media (formerly Hachette SAS); and Lagardère Media is a wholly-owned subsidiary of Lagardère SCA, which is traded on the Paris stock exchange. Lagardère SCA has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................1

COUNTERSTATEMENT OF ISSUES PRESENTED..............................................4

STATEMENT OF THE CASE..............................................................................4

    I.    COUNTER-STATEMENT OF FACTS ........................................4

        A.    BOB Could Not Match the Prices Charged By The Major E-Book Retailers ..................................................................5

        B.    The Courts' Determination Of A Conspiracy To Raise E-Book Prices .........................................................................8

        C.    Agency Pricing Leveled The Playing Field And Helped BOB And Major Retailers.............................................10

        D.    Even When It Had the Opportunity, BOB Never Competed with Major Retailers on the Price of E-Books ...............13

        E.    The Aggressive Competition in the E-book Market Had BOB on the Path to Failure Prior to the Adoption of Agency .......13

           1.    BOB Did Not Have the Advanced Technology to Compete with Major Retailers .................................14

           2.    BOB Faced Additional Problems that Contributed to Its Inevitable Demise ...................................................16

    II.    PROCEEDINGS BELOW ......................................................18

STANDARD OF REVIEW ................................................................................21

SUMMARY OF ARGUMENT ..........................................................................22

ARGUMENT ................................................................................................26

    I.    The Undisputed Record Evidence Establishes That BOB Cannot Show Antitrust Injury ............................................................26

        A.    The District Court Correctly Held that BOB Cannot Establish Antitrust Injury Because It Cannot Prove That It Was Harmed By The Inability To Discount After The Adoption Of Agency .....................................................27

           1.    The Undisputed Record Shows That BOB Was Not Injured By Reduced Price Competition ...................................28

      2.      BOB's Attempts To Establish Antitrust Injury Are Unavailing ................................................................34

    B.      The District Court Correctly Held That The Product Outage Cannot Be The Basis For Antitrust Injury ....................................40

II.     The Undisputed Record Evidence Establishes That BOB Cannot Show Causation ................................................................44

    A.      The District Court Correctly Held That BOB Cannot Establish Causation Attributable To Agency Pricing ...................47

        1.      BOB Was Failing Prior to Agency ............................................48

        2.      BOB Specifically Rejected Agency Pricing As The Cause Of Its Failure ................................................51

        3.      BOB Identified Numerous Material And Substantial Causes of its Failure Unrelated to Agency Pricing ..................51

    B.      BOB's Attempts To Explain The Record Do Not Establish A Genuine Dispute .........................................................56

        1.      BOB's Limited Evidence Does Not Establish A Genuine Dispute Of Material Fact ..........................................56

        2.      BOB's Explanations For Alternative Causes Do Not Establish A Genuine Dispute Of Material Fact .......................58

CONCLUSION .....................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*,
626 F.3d 699 (2d Cir. 2010) ..............................................................36

*Alan's of Atlanta, Inc. v. Minolta Corp.*,
903 F.2d 1414 (11th Cir. 1990) ........................................................39

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).........................................................................22

*Anderson News, L.L.C. v. Am. Media, Inc.*,
123 F.Supp.3d 478 (S.D.N.Y. Aug. 20, 2015) .................................48

*Argus, Inc. v. Eastman Kodak Co.*,
612 F. Supp. 904 (S.D.N.Y. 1985), *aff'd*, 801 F.2d 38 (2d Cir. 1986) ..45, 46, 48

*Argus, Inc. v. Eastman Kodak Co.*,
801 F.2d 38 (2d Cir. 1986) .......................................................*passim*

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Contractors*,
459 U.S. 519 (1983)..........................................................................44

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)....................................................22, 23, 40, 41

*Bigelow v. RKO Pictures, Inc.*,
327 U.S. 251 (1946).........................................................................55

*Blue Shield of Virginia v. McCready*,
457 U.S. 465 (1982).........................................................................43

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)....................................................26, 27, 40, 43

*Callahan v. A.E.V., Inc.*,
182 F.3d 237 (3d Cir. 1999) ............................................................57

*Cash & Henderson Drugs, Inc. v. Johnson & Johnson*,
  799 F.3d 202 (2d Cir. 2015) ......................................................................23, 31

*Comcast v. Behrend*,
  133 S. Ct. 1426 (2013).................................................................................47

*Daniel v. American Bd. Of Emergency Med.*,
  428 F. 3d 408 (2d Cir. 2005) .......................................................................27

*DeLong Equip. Co. v. Washington Mills Electro Minerals Corp.*,
  990 F.2d 1186 (11th Cir.), *amended,* 997 F.2d 1340 (11th Cir. 1993) .............27

*Discover Fin. Servs. v. Visa U.S.A.*,
  582 F. Supp. 2d 501 (S.D.N.Y. 2008) ...........................................................59

*Falls City Indus., Inc. v. Vanco Beverage, Inc.*,
  460 U.S. 428 (1983)......................................................................................39

*In re Flonase Antitrust Litig.*,
  798 F. Supp. 2d 619, 630-33 (E.D. Pa. 2011) ...................................................59

*Garon v. eBay, Inc.*,
  2011 U.S. Dist. LEXIS 148621 (N.D. Cal. 2011) ..............................................42

*Gatt Commc'ns, Inc. v. PMC Assocs, L.L.C.*,
  711 F.3d 68 (2d Cir. 2013) ...........................................................................26

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
  998 F.2d 391 (7th Cir. 1993) ...................................................................*passim*

*Intimate Bookshop v. Barnes & Noble, Inc.*,
  No. 98 Civ. 5564 (WHP), 2003 WL 22251312 (S.D.N.Y. Sep. 30, 2003)........55

*Irvin Industries, Inc. v. Goodyear Aerospace Corp.*,
  974 F.2d 241 (2d Cir. 1992) .........................................................................43

*Lee-Moore Oil Co. v. Union Oil Co. of California*,
  599 F.2d 1299 (4th Cir. 1979) ......................................................................43

*Litton Sys., Inc. v. Amer. Tel. and Tel. Co.*,
  700 F.2d 785 (2d Cir. 1983) .........................................................................59

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
    753 F.3d 395 (2d Cir. 2014) ............................................................25

*Magnetar Techs. Corp. v. Intamin, Ltd.*,
    801 F.3d 1150 (9th Cir. 2015) .............................................25, 46, 55

*In re Master Key Antitrust Litig.*,
    528 F.2d 5 (2d Cir. 1975) ..................................................................44

*Matsushita Electric Industrial Co. v. Zenith Corp.*,
    475 U.S. 574 (1986)........................................................26, 27, 30, 48

*In re NASDAQ Mkt. Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) .....................................................44

*Perkins v. Standard Oil Co. of Cal.*,
    395 U.S. 642 (1969)..........................................................................48

*In re Publ'n Paper Antitrust Litig.*,
    690 F.3d 51 (2d Cir. 2012) .........................................................*passim*

*Rossi v. Standard Roofing, Inc.*,
    156 F.3d 452 (3d Cir. 1998) ............................................................57

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
    No. 98 CIV. 8272 (RPP), 2005 WL 22833 (S.D.N.Y. Jan. 5, 2005)
    *aff'd*, 167 F. App'x 227 (2d Cir. 2005).............................................30

*Scott v. Harris*,
    550 U.S. 372 (2007)..........................................................................22

*Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*,
    63 F.3d 1267 (3d Cir.1995) .............................................................57

*U.S. Football League v. Nat'l Football League*,
    842 F.2d 1335 (2d Cir. 1988) .............................................25, 45, 46

*United States v. Apple Inc.*,
    952 F. Supp. 2d at 698 (S.D.N.Y. 2013) ....................................*passim*

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ...............................................8, 9, 10, 27

*United Mag. Co. v. Murdoch Mag. Distribution, Inc.*,
  393 F. Supp. 2d 199 (S.D.N.Y. 2005), *aff'd sub nom United Magazine Co. v. Curtis Circulation Co.*, 279 F. App'x 14 (2d Cir. 2008) ............................52, 55

*X.L.O. Concrete Corp. v. Rivergate Corp.*,
  83 N.Y.2d 513 (1994) ..........................................................................18

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969) ......................................................................45, 55

**Statutes, Rules, and Regulations**

15 U.S.C. § 1 ...............................................................................................18

15 U.S.C. § 15 ........................................................................................25, 44

16 C.F.R. 233.3 ..........................................................................................38

Fed.R.Civ.P. 56(a) ......................................................................................22

N.Y. Gen. Bus. Law § 340 ..........................................................................18

**Other Authorities**

Philip A. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 338 (Causation and Injury-In-Fact) ...........................................................................................47

## PRELIMINARY STATEMENT

Plaintiff-Appellant Abbey House Media, Inc., d/b/a BooksOnBoard ("BOB") was never the "thriving" business, or even the "successful niche player," that it describes in its brief. It was a small e-books retailer that—in the words of its own CEO—could not "really compete with the big boys," like Amazon and Barnes & Noble. BOB suffered from many competitive disadvantages. Its costs were higher than those of the major retailers. It did not have a proprietary e-reader device, like the Kindle or Nook. And it faced other technical and commercial setbacks. But one factor in particular, about which there is no genuine dispute on the record, left BOB way behind its competitors: It could not come close to matching the major retailers' rock-bottom prices. As discussed below, BOB's inability to compete on price is dispositive of this appeal, and the grant of summary judgment should be affirmed.

BOB is trying to recover damages from an alleged conspiracy to eliminate retail price competition in the e-books market. It hopes to ride the coattails of a separate trial between the government and Apple, in which the district court, in a decision affirmed by this Court, found that the Publisher Defendants—who were troubled by Amazon's below-cost pricing—conspired with Apple to eliminate retail price competition and raise prices in the e-books market. The conspiracy

was purportedly carried out by adopting in April 2010 an agency pricing model, in which the Publisher Defendants selected the retail price for many e-books.

To recover damages in this case arising from this alleged conspiracy to eliminate price competition, BOB must prove two things: (1) that it suffered "antitrust injury" from agency pricing; and (2) that agency pricing caused its purported losses. It cannot make either showing and therefore there is no genuine dispute as to any material fact because, before the switch to agency, BOB did not—and was unable to—compete on price. In fact, BOB's prices were, on average, approximately 60% higher than Amazon's prices, even after accounting for the use of "rewards" points earned by BOB's customers. Thus, "[a]s BOB acknowledged in 2010 and 2011, the end of retail price competition for a portion of its business actually assisted BOB."

Before the agency model, BOB railed against Amazon's "predatory pricing," calling it a "monopolistic play" that "concentrated the market in Amazon." Accordingly, when BOB learned about the Publisher Defendants' plan to adopt the agency pricing model for e-books, it recognized the benefits it would accrue. It understood that up to that point, the "biggest margin impact was from sub-cost pricing from Amazon and Barnes & Noble" and that agency pricing would put an end to that. Thus, BOB touted that agency would "stabilize[] our gross margin and make[] it more predictable," and could accelerate revenue growth

and profitability.  Even when it complained about other aspects of the agency

model, BOB acknowledged that "the damages we experienced were not in the

fixed pricing."  Indeed, BOB identified at least sixteen reasons for its ultimate

failure, and specifically excluded agency pricing from this list.

Yet, BOB dramatically changed its story when it brought this action.  Now it

insists that its "business model was predicated on aggressively pricing a wide

selection of e-books."  But naked allegations resting on self-serving testimony that

is contrary to the contemporaneous record cannot defeat summary judgment.  Only

evidence can.  Indeed, such allegations are all BOB offers.  As in the strikingly

similar *Argus* case before this Court, BOB relies almost entirely on self-serving,

after-the-fact testimony that is contradicted by the contemporaneous record.  And

just as in *Argus*, which BOB fails to acknowledge, this "proof" is not enough to

withstand summary judgment.  The undisputed record shows that BOB did not and

could not compete on price with the major e-book retailers, like Amazon.  Thus,

BOB was not injured by the elimination of retail price competition, and BOB

cannot show that agency pricing caused its downfall.  Nor can BOB prevail by

asserting injuries unrelated to pricing, like the temporary loss of inventory when

the agency model was first adopted.  The elimination of price competition is the

sole alleged antitrust violation in this case; thus, harms resulting from reduced

price competition are the only cognizable injuries.  Because BOB concededly

3

benefited from agency pricing, the district court's order granting summary judgment should be affirmed.

## COUNTERSTATEMENT OF ISSUES PRESENTED

1. Whether the district court properly held that BOB failed to establish a genuine dispute as to any material fact as to whether it suffered antitrust injury from agency pricing?

2. Whether the district court properly held that BOB failed to establish a genuine dispute as to any material fact as to whether its failure was caused by agency pricing?

## STATEMENT OF THE CASE

## I.     COUNTER-STATEMENT OF FACTS

BOB was an online e-book store, founded in 2006 by Robert LiVolsi. LiVolsi started BOB because he saw opportunities in a market then unoccupied by major online and book retailers, like Amazon and Barnes & Noble.  JA509 ¶ 89; JA1485:12-20; JA1492:12-23.  Initially, BOB gained some customers and a modest market share.  JA291.  But, beginning in late 2007, BOB's business stagnated when Amazon and Barnes & Noble re-entered the e-book market and began offering prices well below the Digital List Price ("DLP").  JA1494:14-JA1495:2; JA617; JA1513:14-24; JA1663:6-JA1665:23; JA736; JA629-30.  Those major retailers priced the most popular e-books not only below the prices at which BOB could afford to sell them, but often *below cost*.  JA1497:20-JA1498:17.

4

BOB, a small retailer with limited resources whose e-book costs were higher than those of its larger competitors', could not keep up with those prices. JA619; JA639. Before the adoption of the agency pricing model in April 2010—the object of the alleged antitrust conspiracy—one fact defined BOB's position in the market: It could not compete on price.

## A. BOB Could Not Match the Prices Charged By The Major E-Book Retailers

Price-cutting—even to the point of selling items below cost—makes sense for some competitors. Small profit margins may be acceptable if sales volumes are large enough or if the increased consumer traffic leads to the sale of other more profitable goods to those consumers. Even selling at a loss may be acceptable if, for example, it supports sales of other products. Amazon and Barnes & Noble priced e-books aggressively, including selling many popular books below cost, because they could afford to do so. Amazon in particular became known for establishing a $9.99 price-point, selling popular hardcover-equivalent e-books for a price that was often below the cost that Amazon paid for that e-book. JA1499:15-JA1501:2; JA1504:21-JA1505:24; JA1509:2-JA1510:4; JA617. Barnes & Noble offered deep discounts on a wide array of titles, including "paperback equivalent e-books," which BOB said were its "bread and butter." JA1513:14-24; JA1663:6-JA1665:23; JA736; JA629-30. To compete with Amazon, Sony also began to sell e-books at deep discounts, including some below cost. JA1509:2-20; JA1633:14-

JA1634:20; JA1638:6-20; JA725.  These giant competitors could absorb losses from e-book sales while they earned customer loyalty and increased demand for their proprietary e-reader devices.  JA619.

Not so for BOB.  On a few occasions, BOB attempted to compete with major retailers' low prices in 2008 and 2009.  But each time it had to pull back its discounts because the losses were too great to bear.  BOB was "overly aggressive" with its discounting, leading to margins that were "catastrophic with over $60k losses in December [2008] and January [2009]."  JA1604:14-JA1606:16; JA707.  In August 2009, BOB's income and margins were substantially impacted by aggressive pricing and by BOB's attempts to match the low prices in the market.  JA1642:21-JA1645:5; JA728.  BOB was paying $13 or $14 for certain e-books it sold for $9.99, and even more for certain popular new releases that "cost [BOB] about $7 straight out of the bottom line."  JA1511:7-JA1512:7; JA734.  In August 2009, BOB's CEO wrote that "[m]argin continues to haunt us as the 9.95 thing is starting to cut into us."  JA728; JA1644:18-JA1645:5.  And in 2009, when BOB's margins became too thin because of price competition by the major retailers, BOB took the only measure available to it—it raised prices.  JA1607:6-11; JA1610:22-24; JA1653:6-JA1654:5; JA707-08; JA710; JA731-32.

In fact, BOB would "rarely…compete with some of the 9.99 stuff that Amazon and later Barnes & Noble did."  JA1497:11-19.  Instead, in late 2009

BOB publicly assailed Amazon, calling Amazon's pricing strategy "predatory" and a "monopolistic play" that "concentrated the market in Amazon."  JA601-02; JA798.

BOB now asserts its business model "was predicated on competitive prices and discounting," and that its mission was "to remain price competitive even when faced with steep competition from bigger retailers."  Br. at 33.  But the undisputed summary judgment record shows that BOB could not afford to compete on price with the major retailers.  On the contrary, BOB sold e-books, on average, at much higher prices than Amazon and other competitors, even after applying BOB's rewards and other discounts.  JA302-307 ¶¶ 39-45.[1]

BOB's much higher prices also came on top of significantly higher costs than its larger competitors.  BOB did not have "direct" relationships with any major publishers, including the Publisher Defendants.  JA1661:19-25.  Other retailers that dealt directly with publishers, rather than through wholesalers, could

---

[1] BOB argues that Defendants' expert Dr. Carlton's analysis contained errors that skewed this pricing analysis.  However, even Plaintiffs' expert's purported correction only shows that BOB's prices were competitive with Amazon's for a short period from December 2008 through February 2009, before returning to being approximately 60% higher than Amazon's prices.  JA453.  Further, Carlton noted that correcting for that error resulted in BOB's prices averaging 58% higher than Amazon's, rather than 60% higher.  Errata to Expert Report of Dennis W. Carlton, Exhibit 3 to Opposition to Declaration of Richard S. Snyder in Opposition to Motion to Exclude Expert Opinions of Dennis W. Carlton, *DNAML Pty, Ltd. v. Apple, Inc. et al*., No. 13-cv-6516, D.E. 227-3.

acquire e-books at 50% of DLP.  JA728; JA296-97 ¶¶ 25-26; JA305 ¶ 43.  BOB, however, typically purchased e-books at 60% of DLP through its wholesalers, OverDrive Inc. ("OverDrive") and Ingram DV LLC a/k/a Lightning Source Inc. ("Ingram").  JA1497:6-10; JA1645:8-JA1646:11.  LiVolsi recognized that the "challenge is competing with 40% discount as a starting point against those with deeper pockets and 50% as a starting point."  JA728.

BOB simply did not compete on price with billion dollar companies like Amazon and Barnes & Noble.  JA1608:9-JA1609:12; JA1647:16-23; JA728.  And its higher prices are borne out by its gross profits margins.  In 2009, its gross profit margins were 18.6%, whereas Amazon's were just ███, meaning that its prices were substantially higher than those of its largest competitor.  Supplemental Appendix ("AA") AA-65 ¶ 106.  The price difference is even more staggering considering BOB's costs were up to 10% higher than Amazon's.  And yet even with these higher margins, BOB was not profitable.  JA714.

## B.    The Courts' Determination Of A Conspiracy To Raise E-Book Prices

BOB and other small retailers were not the only ones hurt by Amazon's low prices.  "Publishing companies . . . saw Amazon's ebooks, and particularly its $9.99 pricing, as a threat to their way of doing business."  *U.S. v. Apple, Inc.*, 791 F.3d 290, 296 (2d Cir. 2015).  "At this price, Amazon was selling certain new releases and bestsellers at a price that roughly matched, or was slightly lower than,

the wholesale price it paid to publishers." *Id.* at 299 (internal quotation omitted). In its decision holding Apple liable to e-book consumers for antitrust violations, the district court found that the Publisher Defendants opposed Amazon's $9.99 pricing for many reasons, including that it cut into sales of more profitable hardcover books, threatened brick-and-mortar stores, and threatened consumers' valuation of prices for all books, as well as that Amazon might wield its growing power to demand lower wholesale prices or cut out publishers entirely. *U.S. v. Apple, Inc.*, 952 F. Supp. 2d 638, 649 (S.D.N.Y. 2013).

According to Judge Cote—the same judge who granted summary judgment against BOB—the Publisher Defendants and Apple therefore entered into an "overarching agreement to raise prices above the $9.99 industry norm."[2] *Id.* at 701. The court found that when Apple contacted publishers about selling e-books on its as-yet unannounced iPad, the Publisher Defendants each realized they had an opportunity to pressure Amazon to raise its $9.99 price point. *Apple*, 791 F.3d at 301-302. At the time, e-books were sold under the wholesale business model. Publishers sold the e-books at a wholesale price to retailers and suggested the DLP,

---

[2] Only Apple was adjudicated liable for antitrust violations. "All five Publisher Defendants settled and signed consent decrees . . . ." *Apple*, 791 F.3d at 296-97. As below in their motion for summary judgment, on this appeal, Publisher Defendants do not concede the existence of an alleged conspiracy but do not raise or argue any issues related to such a conspiracy because, even if Plaintiff could establish that such a conspiracy did exist, its claims would still fail as a matter of law.

and retailers then determined the retail price. *Id.* at 298. On April 1, 2010, with the introduction of Apple's iPad device, the Publisher Defendants implemented the agency pricing model, where the publisher set the retail price for an e-book and the retailers sold the e-book as the publisher's agent, earning a commission on the sale price. *See, e.g.*, JA1331.

The switch to an agency model was later determined to be part of a "conspiracy . . . to raise the price of ebooks—particularly new releases and *New York Times* bestsellers." *Apple*, 791 F.3d at 297. The court did not find the "agency model" itself, "or any one of the clauses included in the [agency] Agreements," to be "inherently illegal." *Apple*, 952 F. Supp. 2d at 698. But it nonetheless found Apple liable for antitrust violations based on its conclusion that "Apple and the Publisher Defendants agreed to work together to eliminate retail price competition in the e-book market and raise the price of e-books above $9.99." *Id.* at 647.

### C. Agency Pricing Leveled The Playing Field And Helped BOB And Major Retailers

BOB now casts itself as the victim of a conspiracy to raise e-book prices, alleging that before agency it "priced its e-books around or below the prevailing market rate of $9.99" and that its "business model was predicated on aggressively pricing a wide selection of e-books." JA108 ¶ 91. The undisputed contemporaneous evidence shows otherwise. And when agency pricing was

introduced, BOB recognized that this pricing model would help it fight back against Amazon and noted that the agency model would help BOB because of "[a]ccelerated revenue growth rate" and would "improve our profitability." JA607; JA664. And, as expected, with agency pricing in effect, Amazon and other major retailers stopped selling the Publisher Defendants' e-books at steep discounts that BOB could not match. JA681; JA298 ¶ 30.

After the switch to agency, BOB's CEO continued to recognize that agency pricing benefited BOB. Months after the adoption of agency, LiVolsi wrote: "Agency model discussed is actually a good thing for us once past the integration of it as it stabilizes our gross margin and makes it more predictable…[BOB's] biggest margin impact was from sub-cost pricing from Amazon and Barnes & Noble. Under [agency], pricing is fixed across the board." JA681; JA1571:13-JA1572:15; JA1573:13-JA1574:7. More than a year after agency was adopted, LiVolsi suggested that a small, independent publisher should use "an agency-style relationship instead of a reseller relationship" to "firm up a level playing field across all retailers." JA695; JA1585:2-JA1586:19.

BOB perceived downsides to the agency model too, but they had nothing to do with e-book pricing. JA681. That distinction is critical because the illegal conduct found by the district court was an agreement to raise prices—the court did not find the agency model itself or other terms of agency agreements to be

unlawful. *See Apple*, 952 F. Supp. 2d at 700-01 ("[T]he Plaintiffs have not argued that there is anything inherently wrong with an agency model . . . . The question instead is whether competitors joined forces to eliminate price competition and raise prices . . . .").

BOB worried about uncertainty around the launch of agency and the "integration" of the agency model when its suppliers, Ingram and Overdrive, failed to provide e-book titles from the Publisher Defendants to BOB for weeks after the transition. JA681; JA1571:13-JA1572:15; JA632; JA609; JA653. This outage—which only affected e-books from these publishers—did not last long: BOB had HarperCollins titles back in stock by April 12, 2010, less than two weeks after the switch to agency, and had titles from three of the five Publisher Defendants back in stock by May 24, 2010. JA671; JA1555:7-12; JA676; JA1556:9-JA1563:22. But despite the outage's limited duration, it occurred at a time when BOB was already in a precarious position. JA687. BOB would later—repeatedly—state that its problem with agency was "not in the fixed pricing, but in the sudden lack of availability of product through the wholesale channel," and expressly distinguish the outage from the restrictions on price competition in the agency pricing model. JA649; *see also* JA652; JA656.

**D.    Even When It Had the Opportunity, BOB Never Competed with Major Retailers on the Price of E-Books**

After the Publisher Defendants adopted agency pricing, BOB continued to struggle to compete with bigger retailers on non-agency titles.  After agency, BOB still did not compete with Amazon on "9.99 big money losers" and failed to match Barnes & Noble and Books-A-Million (another online retailer) on titles not affected by agency, which were half its business.  JA679; JA746; JA1569:15-25; JA1685:2-17; JA1566:21-JA1567:9; JA1567:20-JA1568:9; JA1663:6-JA1665:23; JA687.  BOB's idea of "discounting" continued to be in the range of "21% across the board" below DLP—which still resulted in prices far higher than Amazon's average price.  JA649; JA306.  In September 2010, BOB cited "Barnes & Noble's sub-cost competition entering the market" as an impact on BOB's profitability.  JA687; JA1576:24-JA1577:15.  BOB felt the impact of this competition, and in May 2011, LiVolsi wrote:  "[D]eeper pockets than mine are essential when competing in a world where competitors are willing to lose big money indefinitely."  JA619.

**E.    The Aggressive Competition in the E-book Market Had BOB on the Path to Failure Prior to the Adoption of Agency**

Because it could not meet its competitors' lower prices, BOB struggled well before the adoption of the agency pricing model.  BOB's market share plummeted after Amazon entered the market.  JA290-92 ¶ 14, Table 1, Fig. 3.  BOB's share of

e-book revenues dropped from its peak of 3.7% in January 2008 to barely 0.5% of the e-book market in March 2010. *Id*. By then, Amazon, Barnes & Noble, and Sony had captured 98% of the market, while Apple was poised to enter. AA-14 ¶ 13.

BOB's revenue growth halted in 2009 and early 2010, before the adoption of agency pricing. The fallout from a price war between Amazon and Barnes & Noble in late 2009 and early 2010 further depressed BOB's financial results. JA1634:11-JA1636:3; JA1669:12-19; JA725. In January 2010, an investor in BOB wrote: "I do not see how BOB can survive a race to the bottom between these two giants." JA604. BOB's net ordinary income in September 2009 was *negative* $120,000 and revenues from books sales dropped approximately $40,000 from August 2009. JA1634:11-JA1636:3; JA714. From April 2009 to March 2010, the year preceding agency pricing, BOB's revenue plateaued, with monthly e-book revenues fluctuating between $180,000 and $230,000. JA714; JA292 ¶ 15. Indeed, BOB's year-over-year revenue growth was sharply declining in the year leading up to agency. SPA007; *see also* JA964 Fig. 1.

### 1. BOB Did Not Have the Advanced Technology to Compete with Major Retailers

It was not just inability to match retail prices that put BOB at a competitive disadvantage. Unlike Amazon and Barnes & Noble, BOB did not have its own proprietary device for reading e-books. JA1517:9-15; JA1524:18-JA1525:24;

JA294-95 ¶¶ 19-22.  Meanwhile, Amazon and Barnes & Noble each sold

proprietary devices (the Kindle and Nook, respectively) that operated as closed

systems—each functioned only with e-books purchased from the same retailer.

These devices allowed the major retailers both to gain new customers and take

BOB's customers, by locking e-book readers in to a proprietary technology.

JA1508:14-19; JA1503:3-17; JA1520:16-JA1521:18; JA1662:11-14; *see also*

JA294 ¶ 21.  In fact, BOB found "a migration of about 34% of our readers…to

Nooks and Kindles" from early 2011 to November 2012.  JA756.  Customers who

adopted those devices "no longer bought with" BOB, and did not purchase e-books

from BOB for those devices.  JA756; JA1516:8-JA1517:8; JA1502:12-22; JA295 ¶

22.

BOB also failed to develop a well-functioning app for customers to read

BOB's e-books on devices such as Apple or Android phones or tablets.  Instead, its

app required fourteen steps for a customer to purchase an e-book, while Amazon

made it extremely easy to purchase e-books on either its Kindle device or through

the Kindle App.  JA1531:22-JA1532:13; JA1535:11-JA1536:5; JA1537:24-

JA1540:21; JA661-62.

### 2. BOB Faced Additional Problems that Contributed to Its Inevitable Demise

Contrary to BOB's assertion that it had $439,000 in reserves at the end of 2009,[3] BOB was "cash starved" throughout its history prior to the implementation of agency because it never made even a quarterly profit. JA1681:16-JA1682:5; JA715. It owed money to many of its partners, including the wholesalers and small publishers that provided BOB with e-books. JA1507:5-7; JA1548:25-JA1550:2; JA1550:18-22; JA1621:21-JA1622:10; JA1623:8-22; JA1631:2-5; JA720. It fell behind on its debts. JA1632:16-JA1633:13; JA725-26. To combat this problem, BOB reduced investments to attract new customers, delayed payments to its partners, laid off some employees, and cut pay to others. JA1616:5-JA1617:15; JA1648:25-JA1650:11; JA1632:16-JA1633:13; JA710; JA731-32; JA725-26. LiVolsi knew that bigger retailers were "crowding us out with their sheer mass," JA609, and that "deeper pockets than mine are essential when competing in a world where the competitors are willing to lose big money indefinitely." JA619.

In November 2010, well after agency pricing had been in effect, BOB cited five events that "threw off" BOB's business plan. Significantly, agency pricing was not among them. In fact, four of the five events occurred before the switch to

---

[3] BOB's only support for this fact is its damages expert's declaration. JA806 ¶ 7.

agency pricing: (1) a failed partnership with SPI to develop an e-reader device and related software; (2) the "Tyra swindle," which referred to an expensive promotion on "The Tyra Banks Show" that never aired; (3) the creation of a duplicate website by a senior BOB employee that caused a reduction in traffic to BOB's website; and (4) a change by Ingram in its repayment terms that forced BOB to pay debts every thirty days, instead of every sixty days, resulting in a "$130,000.00 swing in cash flow." JA693; JA1581:16-JA1582:2. The other event was the temporary product outage—not the elimination of price competition. *Id.*

BOB had other setbacks too, including: (1) a failure by its wholesalers to deliver certain titles on time (JA1687:21-JA1688:22; JA1689:11-19; JA800; JA622; JA624); (2) a problem with BOB's old website design that made the site not user friendly (JA750-51); (3) a problem with BOB's new website design that inadvertently "bounced" visitors off of BOB's website within seconds and reduced its sales by more than 25% (JA753; JA1690:22-JA1691:18); (4) the Apple app policy, which made it economically untenable for BOB to sell e-books on Apple devices (JA1587:14-25; JA483 ¶ 5; JA514 ¶ 100); and (5) an investigation into potential credit card fraud on BOB's website that prevented BOB from making any credit card sales on its website for seven weeks in 2012 (a period as long as the OverDrive outage) and cost the company several hundred thousand dollars. JA1593:17-JA1595:2; JA1599:2-21; JA627. In January 2013, LiVolsi described

17

the last issue, the credit card problem, as a "major blow" to BOB's business that left it unable to pay its bills. JA1595:11-14; JA1696:3-7; JA704.

## II.    PROCEEDINGS BELOW

Looking to salvage something from a defunct business, BOB began to take entreaties from "numerous contingency litigators in the wake of the DOJ activity." JA649. BOB's CEO drafted a letter to an attorney at HarperCollins, threatening litigation due to the effects of the product outage, while affirming that "the damages we experienced were not in the fixed pricing." JA649.[4] BOB eventually filed this lawsuit, asserting claims for violation of the Sherman Act (15 U.S.C. § 1), and the Donnelly Act (N.Y. Gen. Bus. Law § 340).[5]

BOB's complaint alleged that BOB failed because it could not execute its purported business model of competing aggressively on price. JA80-81 ¶ 4. The Publisher Defendants moved to dismiss a nearly identical complaint[6] brought by DNAML Pty, Ltd. ("DNAML") on the ground that DNAML failed to adequately allege antitrust injury. The Court denied the motion but noted that it may be

---

[4] The district court held that any privilege that had attached to this document had been waived. SPA062 n. 17.

[5] All parties agree that the arguments herein apply equally to BOB's claims under the Donnelly Act as to its claims under the Sherman Act. *See X.L.O. Concrete Corp. v. Rivergate Corp.,* 83 N.Y.2d 513, 518, (1994).

[6] To avoid repetitive briefing, Publisher Defendants, BooksOnBoard, and a similar plaintiff, Diesel Ebooks, LLC, agreed to be bound by the Court's ruling on the Publisher Defendants' motion to dismiss DNAML's complaint.

18

"difficult to show that the adoption of the agency model, and its elimination of retail price competition, was the cause of the harm" the plaintiff asserted. JA571. The court allowed the case to proceed because it was "plausible that a discount retailer was harmed by a conspiracy to remove retailers' ability to discount e-books." JA573.

After completing discovery, the Publisher Defendants moved for summary judgment as to BOB's claims, arguing that the undisputed record showed that BOB could not establish a genuine dispute as to any material fact regarding the elements of antitrust injury and causation. *See* D.E. 132.

On January 22, 2016, the district court granted the Publisher Defendants' motion for summary judgment. SPA002. The court noted the absence of evidence that BOB had suffered antitrust injury or that its failure was caused by agency pricing, and contrasted that with the "overwhelming evidence" to the contrary:

> the Publisher Defendants have provided an extensive record demonstrating that BOB was failing as a business before the Publisher Defendants implemented the agency model for distributing their e-books in 2010, and that BOB could not effectively compete through discounting or otherwise…[and that BOB] touted agency pricing's benefits to both investors and creditors. BOB fails to rebut this evidence and thus has not raised a disputed issue of material fact that would entitle it to a trial.

SPA005. The district court further noted that

> "[d]rawing liberally from BOB's own documents, which include its contemporaneous understanding of its industry and the pressures which caused it to fail, the defendants have presented overwhelming

19

evidence that their elimination of retail price competition did not
cause the demise of BOB's business, and that at the time BOB did not
think it did. As BOB acknowledged in 2010 and 2011, the end of
retail price competition for a portion of its business actually assisted
BOB.  When selling titles as an agent, it was no longer hamstrung by
its inability to compete on price with deeper-pocketed competitors,
such as Amazon and Barney [sic] & Noble."

SPA025-026.

The district court rejected BOB's arguments that it had established a genuine

dispute of material fact sufficient for a trial as to either antitrust injury or causation.

The district court held instead that BOB could not effectively compete with

Amazon and Barnes & Noble, particularly when both of those retailers also had e-

readers, and that BOB could not compete on price on even non-agency e-books.

The district court also held that BOB's focus on its purportedly growing revenues

was belied by its low margins, consistent lack of profit, and the fact that in the six

months before agency began, BOB's revenues were essentially flat, rather than

growing, while its year-over-year growth was "rapidly shrinking." SPA032.

The district court also concluded that the "product outage" was independent

of the "anti-competitive effects" of the adoption of agency, which was the

elimination of retail price competition.  Rather, the district court explained that

"[t]his lawsuit is not premised on a theory that the Publisher Defendants conspired

to eliminate e-book wholesalers or harm independent retailers dependent on

wholesalers."  SPA029.  As an independent factor, the district court determined

that the "dramatic impact of the product outage on BOB's revenue eviscerate[d]" BOB's claimed causal link between BOB's failure and the adoption of agency pricing. SPA030.

Finally, the district court concluded that the documentary record from 2009 to 2011 sharply contradicted the statements of BOB's CEO that agency pricing had caused BOB's failure. The contemporaneous record evidence showed that LiVolsi believed that the adoption of agency would assist BOB, and that his main complaints were related to the impact of the product outage rather than to agency's pricing restrictions. This contemporaneous record sufficiently rebutted LiVolsi's more recent statements, which were primarily made in his 2015 testimony during the litigation.

The district court concluded that

> BOB was engaged in an uphill battle to succeed as an e-book retailer in the face of competition from Amazon, Barnes & Noble and others. … While BOB closed its doors after the Publisher Defendants conspired to eliminate retail price competition in a significant portion of the e-book market, BOB has not presented sufficient evidence to permit a jury to find that the failure of its business was due to that conspiracy.

SPA036.

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed *de novo*. *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012). Summary judgment will be affirmed when, after drawing all reasonable inferences in favor of the non-

moving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "[M]ere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion and a party must do more than simply show that there is some metaphysical doubt as to the material facts." *Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 42 (2d Cir. 1986) (internal quotation omitted).

Only disputes over material facts—"facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Any dispute must also be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## SUMMARY OF ARGUMENT

A plaintiff in an antitrust case must establish—as separate, independent, and necessary elements—that (1) it has suffered antitrust injury, and (2) its claimed damages were caused by the antitrust violation. BOB has the burden of

establishing each element. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). BOB cannot meet either requirement.

I. Antitrust injury is "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield*, 495 U.S. at 334; *see also Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 214 (2d Cir. 2015) (citation omitted). The allegedly anticompetitive conduct in this case was the elimination of price competition. BOB cannot demonstrate antitrust injury from this conduct because BOB's prices were not competitive with the prices charged by the major retailers before agency pricing.

BOB's documents, and an analysis of its sales data, confirm that BOB did not and could not compete on price with the major retailers that employed heavy discounting, including Amazon, Barnes & Noble, and Sony. Those three retailers had achieved a 98% market share even before agency began—while BOB's market share plummeted, and its revenues plateaued even while the e-books market exploded. BOB could not withstand the low prices—and low margins—that bigger retailers were offering, especially with its higher wholesale costs. Thus, its CEO acknowledged that BOB could not compete in the market or with retailers that had "deeper pockets" than BOB. BOB recognized that the end of retail price competition for a portion of its business actually assisted BOB—and then, more

than a year after agency began, suggested that another publisher should adopt

agency to "level the playing field."

BOB's argument that it engaged in price competition is based on anecdotal

evidence of price promotions as a marketing tool to attract customers. But

infrequent promotions cannot overcome the "overwhelming" record evidence

establishing that BOB could not compete on price with Amazon, Barnes & Noble,

and other large retailers. BOB and its expert failed to conduct any analysis of

BOB's purported discounting, and failed to rebut the extensive analysis showing

that its prices and margins were significantly higher than Amazon's. It is

irrelevant whether BOB occasionally sold e-books at a discount from their list

price. BOB undisputedly could not and did not compete with the everyday prices

charged by Amazon and other major retailers, so the elimination of price

competition helped BOB, as its contemporaneous statements repeatedly

acknowledge. BOB therefore cannot show antitrust injury from agency pricing.

The only evidence of harm BOB submitted related not to agency pricing but

to a drop in revenues that was due to a temporary outage of some e-books. The

district court properly held that the product outage did not constitute antitrust

injury because it was not related to the aspect of the alleged conspiracy that was

anticompetitive—namely, the elimination of retail price competition. BOB itself

repeatedly recognized this distinction during the relevant period.

24

II.    BOB also cannot make the requisite showing of causation. *See* 15 U.S.C. § 15. BOB must establish that "the injuries alleged would not have occurred *but for*" the defendants' antitrust violation. *Publ'n Paper*, 690 F.3d at 66 (citation omitted) (emphasis in original); *see also Argus*, 801 F.2d at 41. It must also "demonstrate that the defendant's conduct was a substantial or materially contributing factor in producing that injury." *Publ'n Paper*, 690 F.3d at 66. And because the record supports numerous other explanations for BOB's commercial setbacks, BOB must distinguish losses caused by agency pricing from other losses. *See Magnetar Techs. Corp. v. Intamin, Ltd.*, 801 F.3d 1150, 1160 (9th Cir. 2015); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 402-04 (7th Cir. 1993); *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988). A lack of causation in fact "is fatal to the merits of any antitrust claim." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 415 n.8 (2d Cir. 2014) (citation omitted).

BOB cannot establish "but-for" causation, or that agency pricing was a substantial and material factor in its failure. If anything, the contemporaneous record shows that before agency pricing was ever adopted, BOB was already doomed to fail. The district court properly concluded there was insufficient evidence to allow a reasonable juror to find that BOB's failure was caused by agency pricing, rather than by numerous other factors contributing to its decline

that were entirely independent of agency pricing. BOB cannot separate any losses purportedly caused by agency pricing from losses attributable to these other causes, to which BOB itself attributed its problems and eventual failure. The court also held that BOB's drop in revenues in 2010 immediately after the onset of agency, on which BOB relies so heavily, was caused by the product outage, and not by the restrictions on price competition caused by the agency pricing model. BOB's reliance on LiVolsi's made-for-litigation testimony cannot establish a genuine dispute of material fact regarding causation that requires a trial. LiVolsi himself made numerous, consistent, and explicit statements that agency pricing *did not* cause BOB's failure, and the record in this case established that BOB failed in the face of heavy competition from better-funded retailers with lower costs.

## ARGUMENT

## I.  The Undisputed Record Evidence Establishes That BOB Cannot Show Antitrust Injury

A plaintiff in an antitrust case must show that it has suffered "antitrust injury." *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Antitrust injury is more than an injury causally linked to an alleged antitrust violation; it is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.*; *Gatt Commc'ns, Inc. v. PMC Assocs, L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013). Notwithstanding BOB's assertion that the existence of antitrust injury is a question

26

of fact, Br. at 46, it is well established that whether an injury constitutes *antitrust injury* is a question of law. *Matsushita Electrical Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Daniel v. American Bd. Of Emergency Med.*, 428 F. 3d 408, 438-43 (2d Cir. 2005); *DeLong Equip. Co. v. Washington Mills Electro Minerals Corp.*, 990 F.2d 1186, 1194 (11th Cir. 1993), *amended,* 997 F.2d 1340 (11th Cir. 1993).

### A. The District Court Correctly Held that BOB Cannot Establish Antitrust Injury Because It Cannot Prove That It Was Harmed By The Inability To Discount After The Adoption Of Agency

The unlawful conduct alleged in this case was a "conspiracy designed to raise prices." *Apple*, 791 F.3d at 325. The goal of the alleged conspiracy was "to eliminate price competition within the retail market for e-books and to raise the price of e-books." SPA025. It was this effect on prices and price competition— not the "agency model … or any one of the clauses included in the [agency] Agreements"—that was held to be unlawful. *Apple*, 952 F. Supp. 2d at 698.

To show antitrust injury, BOB must therefore show that its harm flows not from agency agreements generally, but from the elimination of e-book price competition. *See Brunswick*, 429 U.S. at 489. It cannot make that showing, as the district court held, because the undisputed evidence establishes that BOB could not and did not compete on price.

27

### 1. The Undisputed Record Shows That BOB Was Not Injured By Reduced Price Competition

Knowing that it must establish antitrust injury caused by the elimination of price competition, BOB alleged that it priced its e-books "around or below the prevailing market rate of $9.99." JA108 ¶ 91; *see also* Br. at 33. BOB supposedly offered both aggressive prices and a rewards program. Br. at 3-4.[7] As a result of agency pricing, BOB supposedly lost its "ability to compete based on price—upon which it predicated its business model." JA108-113 ¶¶ 91, 101, 102; *see also* Br. at 32.

That is BOB's story now. But before BOB conceived of this lawsuit, its position was completely different, both before and after agency was implemented. It complained relentlessly about major retailers' cut-rate pricing, and welcomed agency pricing because it removed one of BOB's main competitive disadvantages. Before agency, BOB candidly admitted that it did not have the resources to "sustain world class competition." JA741. And a year into agency pricing, its CEO acknowledged that it still could not compete on non-agency titles because

---

[7] Moreover, any restriction on the ability to discount, bundle, or offer rewards points on BOB's full catalog was not a function of the Apple agency agreements, which only impacted front list prices. *See*, *e.g.*, JA763 ¶ 5(b). Restrictions on the use of reward programs appeared later only as part of agreements separately and later reached with Amazon. *See*, *e.g.*, JA1401 ¶ 4(a).

"deeper pockets than mine are essential when competing in a world where competitors are willing to lose big money indefinitely."  JA619.

To be certain, BOB did not like everything about the switch to an agency model, including the temporary product "outage" it experienced during the transition to agency.  JA632; JA609; JA653.  But BOB certainly liked one aspect of the agency model: there was less retail price competition.  BOB crowed that agency pricing "creates goodness" for BOB because of "[a]ccelerated revenue growth rate" and "profitability."  JA607; *see also* JA664.  LiVolsi knew that agency was good because its biggest threat was "sub-cost pricing from Amazon and Barnes & Noble."  JA681; JA1571:13-JA1572:15; JA1573:13-JA1574:7.  More than a year after agency pricing began, LiVolsi urged a small publisher to adopt agency pricing too, in order to "firm up a level playing field across all retailers."  JA695; JA1585:2-1586:19.

For antitrust injury, BOB's embrace of agency *pricing* is all that matters.  As the district court explained in the *Apple* case, there is nothing "inherently illegal" about "agency arrangements" or the specific terms of these agency agreements.  *Apple*, 952 F. Supp. 2d at 698.  The switch to agency was held to violate the antitrust laws because of its effect on retail price competition.  *Id.*  But BOB was not harmed by the elimination of retail price competition.  Just the opposite:  it benefited.  And for obvious reasons, BOB cannot establish antitrust

injury when it "actually tended to benefit" from the alleged conspiracy. *See Matsushita*, 475 U.S. at 582-83, 586 (respondents could not recover because "respondents stand to gain from any conspiracy to raise the market price."); *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, No. 98 CIV. 8272 (RPP), 2005 WL 22833, at *20 (S.D.N.Y. Jan. 5, 2005) *aff'd*, 167 F. App'x 227 (2d Cir. 2005) (granting summary judgment, in part, because higher fees allegedly earned by concert promoters benefited plaintiff promoter).

There is no mystery why BOB benefited from reduced price competition: BOB could not match the major retailers' prices. As the district court observed, "BOB could not compete effectively on price with the major retailers who employed discounting, such as Amazon and Barnes & Noble." SPA028. On the contrary, "BOB could not and did not compete successfully in the pre-agency period against larger companies that offered deeper discounts than BOB was prepared or able to offer. Accordingly, BOB's documents reflect LiVolsi's view that the elimination of price competition through the adoption of the agency distribution model would actually assist BOB." SPA034. Even after agency began, BOB "was unable to compete on price with Amazon and other e-book retailers with respect to the e-books for which discounting remained an option." SPA028.

The district court did not, as BOB contends, improperly determine genuine disputes of material fact. District court decisions granting summary judgment over plaintiffs' claims that their injuries were an antitrust injury are routinely affirmed. *See*, *e.g.*, *Argus*, 801 F.2d at 42-45; *Cash & Henderson* 799 F.3d at 214; *Greater Rockford,* 998 F.2d at 404. This is especially true where, as here, the overwhelming contemporary record evidence points in the same direction. This evidence includes LiVolsi's contemporaneous statements confirming that BOB could not compete on price before agency:

- In April 2009, LiVolsi acknowledged that Amazon's "***below cost pricing and proprietary format in the US has significantly damaged our business***." JA639 (emphasis added).

- By September and October 2009, LiVolsi stated that "***the full engagement of the multibillion dollar companies is disrupting the channel***" and fretted that BOB could not "really compete with the big boys." JA725; JA1638:6-20; JA1514:25-JA1515:5; JA642 (emphasis added).

- By November 2009, LiVolsi realized that BOB "***cannot sustain world class competition with just our resources***" and it needed an investment and a "big partner" to "keep up with Amazon, Barnes&Noble, or Indigo/Chapter (Shortcovers)." JA741; JA642 (emphasis added).

31

- In December 2009, LiVolsi was making plans to get out of the business and operate it as a "lifestyle deal" that would not compete with the major retailers. JA743; JA1674:19-JA1675:3; JA1676:11-15.

- On the eve of agency, LiVolsi recounted how Barnes & Noble's entry into the market coincided with BOB's decline, and he wrote: "***I'm concerned the big guy [sic] are simply crowding us out with their sheer mass.***" JA609 (emphasis added).

In late 2009, competition intensified with the entry of Barnes & Noble, and price competition broadened throughout the e-book catalog and into BOB's "bread and butter." JA1663:6-JA1665:23; JA736. Unable to compete at the prevailing $9.99 price, JA1497:11-19; JA604, in December 2009 BOB turned to attacking Amazon's "predatory" pricing and "monopolistic play." JA601-02; JA798.

That BOB charged much higher prices than Amazon and Barnes & Noble was confirmed by Defendants' expert, Dr. Dennis Carlton, a former chief economist at the Department of Justice. Carlton's analysis of BOB's sales data and financial reports revealed that BOB's retail prices were, on average, approximately 60 percent higher than Amazon's retail prices. JA305-306 ¶¶ 43-44. And BOB's modest rewards did not make BOB's prices approach Amazon's despite BOB's anecdotal arguments. *Compare* JA306-07 ¶ 45 *with* Br. at 8-10. BOB's rewards only accounted for approximately 5% of the gross price of

orders—i.e. a small dent in BOB's prices that still did not approach its competitors' prices.  JA305-07 ¶¶ 42-45.  BOB's gross margins also show that its prices overall were significantly higher than its competitors.  JA303-04 ¶¶ 40-41.  In 2009, BOB had gross margins of 18.6%, as compared with Amazon's ███, indicating significantly higher prices, compounded by BOB's higher wholesale costs.  AA-65.  Yet BOB was never profitable.  JA715.  Even after agency began, BOB failed to discount prices on non-agency titles for which it could lower prices, refusing to compete with Amazon on "9.99 big money losers" and failing to match Barnes & Noble and Books-A-Million on non-agency romance and mass market paperback equivalents.  JA679; JA746; JA1569:15-25; JA1685:2-17; JA1566:21-JA1567:9; JA1567:20-JA1568:9.  BOB's claim that its strategy was to focus on discounting these "backlist" titles, Br. at 8, is unsupported by empirical or contemporaneous evidence.

BOB's prices started at a disadvantage to its larger competitors because BOB's costs for each e-book were higher.  Unlike Amazon, Barnes & Noble, and other e-book retailer competitors of BOB that had "direct" relationships with publishers, BOB acquired its e-books through wholesalers to which it paid higher fees.  JA1645:8-JA1646:11; JA1661:19-25; JA728.  As a result, BOB lamented the "challenge [of] competing with 40% discount as a starting point against those with deeper pockets and 50% as a starting point."  JA728; *see also* JA296-97 ¶¶ 25-26;

JA305 ¶ 43. BOB's and its expert's argument that the elimination of price competition "disarmed" BOB from competing on price, where BOB had "rough parity" with its rivals, fails to recognize the obvious significant disadvantage of its wholesaler costs. *See* Br. at 38; JA987-88. Moreover, BOB's argument admits that BOB was "relatively disadvantaged" in other dimensions. *Id.*

The contemporaneous record undeniably shows that BOB's business model did not hinge on aggressive price competition or rewards to match, or even approach, its competitors' prices. Because BOB did not compete with major retailers on the price of the Defendant Publishers' e-books, BOB cannot show antitrust injury from the alleged conspiracy to eliminate retail price competition.

## 2. BOB's Attempts To Establish Antitrust Injury Are Unavailing

BOB argues that it "priced e-books around or below the prevailing market rate and offered promotional discounts and loyalty reward points on top of these prices." Br. at 7. But its evidence in support of this claim consists of: (1) testimony contradicted by the contemporaneous record; (2) anecdotal evidence consistent with the record showing that BOB briefly tried to match lower prices before it lost too much money; or (3) evidence consistent with the record that shows that BOB's "discounts" were modest reductions from DLP rather than discounts below the prevailing rates set by major retailers, which together accounted for approximately 98% of the market.

BOB's modest discounting off its own higher prices—or its brief attempt to match prices before raising them again—cannot help BOB establish antitrust injury. Agency pricing eliminated price competition between retailers. What matters in assessing antitrust injury is whether BOB was competing based on price such that the elimination of price competition injured it. It plainly was not. As noted, under agency, BOB could not underprice Amazon, and Amazon could not underprice BOB. But before agency, this price competition worked overwhelmingly in Amazon's favor. So eliminating price competition benefited BOB, as the contemporaneous evidence shows. That BOB could not set (and therefore reduce) its own prices would be true of any agency distribution model. And, as the district court emphasized, there is nothing unlawful or untoward about agency distribution. The Publisher Defendants' switch to agency pricing was held to be unlawful because it was deemed to be part of a conspiracy to raise e-book prices above $9.99. BOB welcomed that change with open arms.

With overwhelming contemporaneous evidence undermining BOB's claim that its business was predicated on aggressive price competition, BOB relies almost entirely on conclusory deposition testimony and a 2015 declaration from its CEO. None of this after-the-fact testimony, however, is corroborated by business plans, emails, public statements, communications with investors, or other contemporaneous documents.

In light of the contemporaneous evidence, BOB cannot rely on such testimony to raise a genuine dispute of material fact as to antitrust injury and avoid summary judgment. *See AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 735-36 (2d Cir. 2010) (evidence created during litigation could not raise an issue of fact where it was contradicted by documents created at the same time as the transaction at issue); *Argus*, 801 F.2d at 42 ("The failure of a business' management to note at the time what is later claimed by its lawyers to have been a mortal commercial wound weighs heavily against such a claim. It is thus a telling blow to plaintiff's…theory that [the plaintiff's] contemporaneous accounts of the reasons for its economic ailments consistently contradict its present position." (citations omitted)). Such after-the-fact litigation constructs, contrary to contemporaneous evidence documenting the reasons for a business' decline, cannot create a genuine dispute of material fact. *See Argus*, 801 F.2d at 45 ("Such [conclusory] testimony [by plaintiffs' officers and employees], unsupported by documentary or other concrete evidence . . . , is simply not enough to create a genuine issue of fact in light of the evidence to the contrary.").

*Argus* is particularly applicable here. Like BOB, the plaintiff in *Argus* claimed to have been injured by conduct found to be an antitrust violation in a separate litigation. And like in this case, the plaintiff relied on post-hoc self-serving statements that did not line up with the company's contemporaneous

explanations for its severe financial difficulties. *Argus*, 801 F.2d at 42. The plaintiff's "tactically convenient" testimony, conclusory and unsupported, did not raise a triable issue of fact. *Id.* at 42-43, 45. Nor did the testimony and submissions of plaintiff's expert, because his "naked conclusion" was unsupported and could not "rebut the volume of evidence to the contrary." *Id.* at 46. Here, as in *Argus*, BOB's self-serving, after-the-fact testimony and unsupported conclusions from its expert are insufficient to defeat summary judgment because the contemporaneous evidence and data confirm that BOB did not rely on price competition. *Id.*

BOB's expert, Dr. James Ratliff, had no evidentiary basis for his conclusion that "the imposition of the agency model caused by the conspiracy materially injured plaintiffs' businesses." JA377 ¶ 20.[8] And he ignored or assumed away all the evidence to the contrary. Ratliff ignored that BOB did not actually discount relative to its rivals and that, in fact, BOB charged, on average, much higher prices than the major retailers. JA298-300 ¶¶ 30-33. He also ignored that agency pricing prohibited Amazon and other competitors from continuing the massive discounts that were harming BOB's business. JA298 ¶ 30.

---

[8] BOB states that Defendants did not dispute Ratliff's qualifications, Br. at 25, but Defendants filed a motion to exclude his opinions. After granting Defendants' motion for summary judgment, the district court denied the motion to exclude as moot. D.E. 184.

Ratliff tried to justify his failure to address these issues by arguing that discounting is a valuable tool even if a retailer does not offer the lowest prices. BOB in its brief also points to a handful of promotional emails touting "discounts." Br. at 9.[9] But BOB's version of "discounting" is a classic form of deceptive advertising, as the Federal Trade Commission has explained. *See* 16 C.F.R. 233.3 (advertising "discounts" for prices below suggested retail prices, but not below prevailing prices, is deceptive).

These generic assertions about potential promotional benefits of limited discounting are not accompanied by any evidence or analysis showing what percentage of BOB's sales were actually discounted and the actual effects of that discounting for BOB. *See* JA386-89 ¶¶ 51-62. More importantly, neither Ratliff nor BOB ever reckons with the fact that the major retailers were undisputedly discounting e-books much more than BOB ever did or could. The question is not whether BOB sold any e-books at a discount to list price. It is whether BOB was able to compete with the steep discounts offered by its competitors. The record on this point is undisputed: BOB simply could not afford to sell e-books at Amazon's prices.

---

[9] The promotions cited by BOB—"22% off list price"; "24% off list price"—are consistent with Carlton's findings and BOB's statements regarding the modest level of its discounts compared with the prevailing prices at Amazon of approximately 50% off DLP. *Compare* Br. at 9 *with* JA306.

That is why eliminating price competition helped BOB. Whether and to what extent BOB employed some degree of "discounting" from DLP is immaterial when the evidence is clear that even the most optimistic picture of BOB's "discounting" did not approach its competitors' prices. BOB argues that the district court recognized a disputed issue of fact regarding BOB's discounting. Br. at 36. But the district court properly recognized that BOB's arguments about discounting were not *genuine* disputes as to *material* facts. SPA027-28; *id.* at n. 19. Rather, the district court accurately concluded that "what cannot be disputed on this record is that BOB could not compete effectively on price with the major retailers who employed discounting." *Id.*

No case cited by BOB supports BOB's view that it has raised a genuine dispute of material fact as to antitrust injury. *Alan's of Atlanta, Inc. v. Minolta Corp.*, an Eleventh Circuit case, involved allegations of price discrimination that allegedly caused customers to flock towards a lower-cost competitor that could offer lower prices. 903 F.2d 1414, 1427-28 (11th Cir. 1990). *Falls City* was also a price discrimination case in which antitrust injury was found where the plaintiff lost customers as a result of defendants' price discrimination. *Falls City Indus., Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 437 (1983). Here, the alleged conspiracy did not cause BOB to lose customers relative to its competitors. To the contrary, agency pricing benefited BOB by removing one of its competitive

disadvantages—its inability to match larger competitors' prices. And before agency pricing was implemented, BOB's customers were already choosing lower cost competitors with better services, as shown by the record, including BOB's plummeting market share and stagnating revenues. As BOB candidly acknowledged at the time, it was helped—not harmed—by the elimination of price competition.

### B. The District Court Correctly Held That The Product Outage Cannot Be The Basis For Antitrust Injury

BOB also cannot demonstrate antitrust injury based on the temporary product outage. As the Supreme Court has explained, "[a]ntitrust injury does not arise . . . until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct." *Atl. Richfield*, 495 U.S. at 339; *see also Brunswick*, 429 U.S. at 489 (antitrust injury "flows from that which makes the defendants' acts unlawful"). BOB must therefore show antitrust injury from the elimination of price competition, because that is the sole aspect of the agency model that was found to be unlawful. The outage, however, had nothing to with pricing. It was a temporary interruption in some of BOB's supply chain as BOB's wholesalers switched over to agency contracts. Because any losses BOB experienced from the outage did not result from reduced price competition, the outage cannot constitute antitrust injury.

BOB's claim to have been harmed by the outage is not contradicted by

BOB's contemporaneous statements, unlike most of its claims. When the Publisher Defendants switched to the agency model, BOB praised agency pricing as "a good thing for us once past the integration of it," JA681; JA1571:13-JA1572:15, but worried about supply interruptions during the transition. JA681; JA1571:13-JA1572:15; JA632; JA609; JA653. And before bringing this action, BOB repeatedly affirmed that "the damages we experienced were not in the fixed pricing, but in the sudden lack of availability of product through the wholesale channel." JA649; *see also* JA652; JA656. Faced with this record, it is no surprise BOB would turn to the outage to attempt to show harm that it could not make out from agency pricing.

The problem with BOB's reliance on the outage is that agency pricing—and, more specifically, the elimination of price competition to raise e-book prices above $9.99—is the only anticompetitive conduct alleged in this case. As the district court observed, "[t]his lawsuit is not premised on a theory that the Publisher Defendants conspired to eliminate e-book wholesalers or harm independent retailers dependent on wholesalers." SPA029. "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield*, 495 U.S. at 344. The only allegedly anticompetitive aspect of the adoption of the agency model was its effect on price competition.

41

That rules out a finding that injury supposedly suffered from the outage could constitute antitrust injury. The undisputed record shows that the product outage was caused by delay by wholesalers OverDrive and Ingram in entering into new agreements with the Publisher Defendants and their inability to promptly meet certain technical requirements.[10] JA1601:14-JA1602:25; *see also* Br. at 43 n. 17. The outage was completely unrelated to agency pricing. A plaintiff cannot establish antitrust injury when its injury is a result of something other than an anticompetitive aspect of the alleged conspiracy—such as, here, the technical requirements of the agency model. *Cf. Garon v. eBay, Inc.*, 2011 U.S. Dist. LEXIS 148621, at *10-15 (N.D. Cal. 2011).

Nor was the wholesalers' inability to meet technical requirements "inextricably intertwined" with the adoption of agency; the need for new contracts may have been foreseeable, but Ingram's and OverDrive's inability to meet the agency requirements was not, and was not even related to the agency pricing rules. And other independent retailers that had direct agreements with publishers did not experience an outage. SPA029 n. 21. BOB's citation to inapposite out-of-circuit cases does not change this simple fact. *See* Br. at 43 n. 17. Thus, BOB's citation

---

[10] Publishers did not have direct relationships with every retailer because direct relationships required significant upfront and ongoing resources that were too costly to provide to smaller retailers. See, *e.g.*, JA263:3-JA264:10; JA245:8-JA246:11. Publishers also had concerns about the security of their e-book files. JA261:8-JA262:12; JA238:2-22; JA241:19-JA242:9.

to *Lee-Moore Oil Co. v. Union Oil Co. of California* is unavailing because there the plaintiff's injury was the result of defendants' alleged refusal to deal with plaintiffs. 599 F.2d 1299 (4th Cir. 1979). Here, the Publishers were always willing to deal with BOB and did so. The outage was caused by the intervening failures of OverDrive and Ingram to meet the publishers' requirements, and clearly not by the effects on price competition of the agency model. And unlike in *Irvin Industries, Inc. v. Goodyear Aerospace Corp.*, where the plaintiff alleged harm from predatory pricing that caused a loss of sales, the outage here was not an anticompetitive aspect of the elimination of retail price competition. 974 F.2d 241 (2d Cir. 1992).

The cases BOB cites present facts that involve a direct relationship between the alleged anticompetitive conduct and the plaintiff's injury, unlike the facts here. In *Blue Shield of Va. v. McCready*, the Supreme Court reviewed a motion to dismiss on causation issues and determined that a patient of a psychologist had adequately pled causation because her injury—a loss of reimbursement from her health plan—was a direct result of the purported scheme to prevent reimbursement of competing psychologists. 457 U.S. 465, 483-84 (1982). Here, however, temporarily losing certain product is distinct from the alleged conspiracy to eliminate price competition and raise prices. Further, the district court recognized that if the Publisher Defendants had lawfully changed from a wholesale to an

agency model with no collusion, as they maintain they did, the same temporary

outage resulting from that transition would have occurred. SPA029; *see also*

*Brunswick*, 429 U.S. at 487-88 (holding that "respondents' injury was not of 'the

type the statute was intended to forestall,'" where "[r]espondents would have

suffered the identical 'loss'" if the same action had occurred by legal means).

BOB also cites cases in which the plaintiffs were consumers paying higher

prices resulting from a price-fixing scheme. *See In re Master Key Antitrust Litig.*,

528 F.2d 5, 12 n. 11, (2d Cir. 1975); *In re NASDAQ Mkt. Makers Antitrust Litig.*,

169 F.R.D. 493, 526 (S.D.N.Y. 1996). To the extent that any injury resulted from

the outage, BOB does not allege such a direct injury, nor has BOB otherwise

shown that it has suffered an injury "of the type the antitrust laws were intended to

prevent and that flows from that which makes the defendants' acts unlawful."

BOB cannot prove antitrust injury because the undisputed record shows that

it was not harmed by the elimination of retail price competition. Thus, summary

judgment should be affirmed.

## II. The Undisputed Record Evidence Establishes That BOB Cannot Show Causation

Even if BOB could establish antitrust injury, it still could not avoid

summary judgment because it has not raised a genuine dispute as to whether

agency pricing caused its purported damages. "Causation in fact is, of course, a

necessary element of any claim for relief under Section 4 of the Clayton Act…lack

of causation in fact is fatal to the merits of any antitrust claim." *Argus*, 801 F.2d at 41; 15 U.S.C. § 15; *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Contractors*, 459 U.S. 519, 537 (1983) (plaintiff must prove a "causal connection" between alleged conduct and injury). "The proof required to show *causation* of damages is greater than that required to prove the *amount* of damages, where a plaintiff is afforded more latitude due to the 'vagaries of the marketplace.'" *Greater Rockford*, 998 F.2d at 401; *accord*, *U.S. Football League*, 842 F.2d at 1378.

There are three prongs an antitrust plaintiff must satisfy to establish causation:

*First*, a plaintiff must "demonstrate that [the defendant's] conduct was a substantial or materially contributing factor" in producing that injury.") *Publ'n Paper*, 690 F.3d at 66; *see also Argus, Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904, 918 (S.D.N.Y. 1985), *aff'd*, 801 F.2d 38 (there must be a causal connection "sufficient to show that the violation was a 'material cause' or 'substantial factor' in causing plaintiff's injuries.") (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969)). While a plaintiff need not exhaust all possible alternative causes of its injury, it must make a sufficient showing that its injuries were caused by the unlawful conduct. *Publ'n Paper*, 690 F.3d at 66.

*Second*, "a plaintiff must establish that "the injuries alleged would not have

45

occurred *but for* [the defendant's] antitrust violation, adding necessity to the materiality requirement of our antitrust causation analysis." *Publ'n Paper*, 690 F.3d at 66 (emphasis in original) (quoting *Argus*, 801 F.2d at 41).[11]  Where a company is in "dire financial shape" prior to the alleged antitrust violations, it is unlikely that the destruction of that business was caused by anticompetitive activity. *See Argus*, 612 F. Supp. at 920-21; *see also Argus*, 801 F.2d at 43-44 (affirming decision, in part, because plaintiff was in "severe decline well before" the alleged antitrust violation and finding no plausible causation in fact where the plaintiffs were "wallowing in deep financial trouble" at time of alleged antitrust violation).

**Third**, where there are numerous other reasons for a company's failures, a plaintiff must distinguish damages caused by the alleged antitrust violation from those caused by other factors. *See Magnetar*, 801 F.3d at 1160 (where damages expert did not "separate the losses suffered as a result of [defendant's illegal] conduct from the total losses suffered by [plaintiff], it would have been impossible for a jury to estimate the lost profits attributable to [defendant's] conduct"); *Greater Rockford*, 998 F.2d at 402-04 (granting summary judgment where the alleged antitrust violation was one out of nine causes and there seemed to be no way of weighting them); *U.S. Football League*, 842 F.2d at 1378-79 (a plaintiff's

---

[11] The district court did not reach this reason in its decision.

proof of damages "must provide the jury with a reasonable basis upon which to estimate the amount of its losses caused by other factors," and plaintiffs must segregate losses caused by defendant's misconduct from "losses caused by other factors, such as management problems"); *Argus*, 801 F.2d at 43-45 (affirming summary judgment where contemporaneous documents showed that plaintiff attributed its failures to problems other than alleged anticompetitive conduct); *Comcast v. Behrend*, 133 S. Ct. 1426, 1433 (2013).[12]

### A. The District Court Correctly Held That BOB Cannot Establish Causation Attributable To Agency Pricing

BOB argues that it was a successful and growing business prior to agency, and that it has at least presented sufficient evidence in the record to establish that it failed due to an inability to discount after the adoption of agency. But this portrait of the company ignores reality, and the overwhelming record in this case, while distorting the few facts it offers.[13] Rather, BOB's claims are based almost entirely on LiVolsi's testimony during this litigation, which are contradicted by the contemporaneous evidence. BOB was well on its way to failure before agency

---

[12] *See also* Philip A. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 338 (Causation and Injury-In-Fact) ("[W]hen other forces overwhelm the alleged violation in explaining the plaintiff's situation, then the violation would not be a significant, substantial, or material cause.").

[13] *See* Exhibit A to the Publisher Defendants' Reply Memorandum of Law, comparing the Publisher Defendants' 56.1 statement, BOB's response, and the Publisher Defendants' conclusions as to material disputes of fact. JA1231-86.

began, and its fate was sealed by cascading errors unrelated to agency pricing. Meanwhile, BOB repeatedly confirmed that agency pricing was ***not*** a cause of BOB's failure.[14] BOB's "contemporaneous documents . . . conclusively contradict [its] litigation stance" and instead show that BOB was struggling to survive before the adoption of agency pricing, and ultimately failed for numerous reasons other than agency pricing. *Argus*, 612 F. Supp. at 921-22; *see also Argus*, 801 F.2d at 43.

### 1. BOB Was Failing Prior to Agency

The record unambiguously shows that BOB was headed for failure before the Publisher Defendants adopted agency pricing. As discussed in part above, BOB's failure was inevitable regardless of agency because it was not competitive against much larger, better-funded retailers such as Amazon and Barnes & Noble.

---

[14] BOB incorrectly asserts that summary judgment was not appropriate here because causation is fact-intensive. Br. at 15. Courts routinely grant summary judgment where the non-moving party fails to provide sufficient proof of causation. *See, e.g.*, *Matsushita*, 475 U.S. at 586-87 (1986); *Argus*, 801 F.2d at 42-45; *Anderson News, L.L.C. v. Am. Media, Inc.*, 123 F.Supp.3d 478, 509-10 (S.D.N.Y. 2015), *appeal filed*, No. 15-2894 (2d Cir. Sept. 15, 2015). None of the cases BOB cites, including those from before *Celotex* and *Matsushita*, suggest that a plaintiff is not required to meet this burden of proof. *See, e.g.*, *Perkins v. Standard Oil Co. of Cal.*, 395 U.S. 642, 648-49 (1969) (requiring "sufficient evidence in the record to support an inference of causation"); *see also Publ'n Paper*, 690 F.3d at 61, 67-8 ("[S]ummary judgment serves a vital function in the area of antitrust law.'").

*See supra* 5-14.  Due to the many advantages that those larger retailers had over BOB, BOB was quickly losing ground.

BOB was in desperate financial straits prior to agency.  Its revenues were stagnant.  JA714; JA292.  Its market share had almost completely evaporated.  JA289-91 ¶¶ 13-14.  And it had massive debts.  JA1507:5-7; JA1548:25-1550:2; JA1550:18-22; JA1632:16-JA1633:13; JA725.  By December 2009, BOB's net losses had accrued to more than $1.2 million.  JA317.  It was forced to lay off employees and cut salaries to survive.  JA1636:24-JA1637:8; JA725.  But, despite these cuts, BOB was never profitable.  JA714; JA1543:5-10; JA1614:21-24.  It failed to meet its own internal targets that might allow it to "prevent further cuts" and "start[] to catch up."  JA731-32; JA1655:7-JA1657:7.  It even failed to meet its own projections after it had revised them downward.  JA313-14 ¶¶ 59-61, Fig. 7.

BOB focuses on its year-over-year growth or its quarterly revenues, Br. at 19, and even more broadly on annual revenues, Br. at 47, but ignores the fact that prior to agency, its growth was nearly non-existent.  From the second to the third quarter of 2009, BOB's revenues increased by approximately 3%; from the third to the fourth quarter of 2009, BOB's revenues increased by 0.2%; and, from the fourth quarter of 2009 to the first quarter of 2010, BOB's revenues increased by 0.7%.  Br. at 19; JA715.  Moreover, BOB's year-over-year growth was declining substantially prior to agency.  JA439 Fig. 1.  BOB also claims that a citation to

market share is misleading because the e-books market was growing so rapidly. Br. at 23. But this ignores that Amazon, Barnes & Noble, and Sony were capturing all of the new business in the market and taking BOB's customers too. JA1508:14-19; JA1516:8-JA1517:8; JA756. LiVolsi often wrote about BOB's inability to compete with bigger retailers:

- In September 2009, LiVolsi wrote: "Fundamentally, the full engagement of the multibillion dollar companies is disrupting the channel." JA725; JA1638:6-20.

- In October 2009, LiVolsi wrote: "Bottom-line: without 7 figure raise pr [sic] big partner, the space has now accelerated to where we cannot keep up with Amazon, Barnes&Noble, or Indigo/Chapter (Shortcovers)." JA642.

- In November 2009, LiVolsi wrote: "I'm realistic enough to know that I cannot sustain world class competition with just our resources here against the likes of Amazon, Barnes & Noble and Waterstones." JA741.

- In December 2009, LiVolsi wrote about "preserv[ing the] business" and "taking [a] paycheck elsewhere." JA743.

- And just before agency began, LiVolsi wrote: "I'm concerned the big guy [sic] are simply crowding us out with their sheer mass." JA609.

### 2. BOB Specifically Rejected Agency Pricing As The Cause Of Its Failure

While LiVolsi identified BOB's inability to compete with larger retailers, he never raised agency pricing as negatively affecting BOB's business in notes to his employees, to himself, or even in a communication with a Defendant in which he was threatening to bring a lawsuit. *See* JA649; *see also* JA1546:24-JA1547:13; JA1576:24-JA1579:18; JA683; JA687-88. Rather, LiVolsi often singled out agency pricing as *not* being the reason for BOB's issues. JA649; JA652; JA656. He wrote in the Wikipedia page for "e-book" that BOB and similar small retailers were "squeezed out ***not by the agency scheme itself***, but by the failure of the publishers to work with smaller, long-term retailers in the wholesale channel on a timely basis." JA656 (emphasis added). And LiVolsi later wrote that "[t]he damages we experienced ***were not in . . . fixed pricing***." JA649 (emphasis added).

### 3. BOB Identified Numerous Material And Substantial Causes of its Failure Unrelated to Agency Pricing

To the extent BOB could show that it was harmed at all by agency pricing, the numerous alternative factors that harmed BOB's business defeat its claims because they overwhelm any harmful effect that a fact-finder could find resulted from the elimination of price competition. *See Greater Rockford*, 998 F.2d at 402-04 ("Standing alone one of these alternative causes of the plaintiffs' injuries might be insufficient to put causation-in-fact in question. Taken together, however, the

plaintiffs have failed to show with a fair degree of certainty that 'but for' the alleged antitrust violation, the plaintiffs would not have suffered the injuries of which they complain."); *see also United Mag. Co. v. Murdoch Mag. Distrib., Inc.*, 393 F. Supp. 2d 299, 212-13 (S.D.N.Y. 2005) (granting summary judgment where "plaintiffs have failed to account for these other causes" of their alleged injuries).

The overwhelming contemporaneous record evidence shows that BOB's failure resulted from causes other than an inability to compete on price. BOB's own documents reveal that there were at least sixteen separate issues wholly unrelated to agency pricing that harmed BOB's business and collectively caused BOB to fail. Indeed, BOB identified the following issues, each of which contributed to BOB's demise and had nothing to do with agency pricing:

1. Price competition advanced by major retailers before adoption of the agency model that pushed the market to sell e-books at low prices (often $9.99) with which BOB could not compete (*supra* 5-14);

2. Price competition on non-agency titles after adoption of the agency model (JA679; JA619; JA1566:21-JA1567:9; JA1567:20-JA1568:9; JA1569:15-25);

3. BOB's failure to secure direct relationships with many major publishers (JA728);

4. BOB's failure to develop a proprietary device to read e-books, and

reliance on customers downloading e-books to computers (JA693; JA612; JA294-95 ¶¶ 19-22; JA1692:9-JA1693:21; JA756);

5. BOB's inability to sell e-books to certain proprietary devices provided by major retailers, such as Amazon's Kindle (JA1502:12-22; JA295 ¶ 22);

6. BOB's inferior apps for phones and tablets (JA661-62; JA1535:11-JA1536:5);

7. The economic recession (JA739);

8. A duplicate website set up by a BOB employee that reduced traffic to BOB's actual website (JA1666:10-JA1668:2; JA629-30; JA693);

9. Problems with the user friendliness and design of BOB's website (JA717; JA1618:3-17; JA725);

10. BOB's constant undercapitalization (JA1686:22-16887:7; JA681);

11. A failed attempt to promote BOB on the "The Tyra Banks Show" that BOB arranged and paid for but never aired (JA693; JA1639:10-14);

12. Ingram's change in terms for BOB to satisfy its accounts payable that resulted in a "$130,000.00 swing in cash flow" (JA693; JA725; JA1634:11-25);

13. The unavailability of certain e-books from the Publisher Defendants after the adoption of agency due to the outage (JA652);

14. The failure by OverDrive and Ingram to consistently provide frontlist

titles (JA624; JA1687:21-JA1688:22);

15. Apple's app store policy change, which caused any sale that BOB made through an app purchased on iTunes automatically result in a loss (JA1588:25-JA1589:19; JA1595:15-JA1596:7; JA112 ¶ 100); and

16. BOB's inability to process credit cards for seven weeks in 2012. JA1593:17-JA1595:14; JA1599:2-25; JA627; JA704.

Because BOB and its experts do not and cannot meaningfully disaggregate agency pricing from any of the more than sixteen identified alternative causes for its failure, BOB cannot raise a triable dispute of fact as to causation. Instead, without any detailed analysis or consideration of the contemporaneous record, BOB's causation expert simply assumed that the Publisher Defendants' actions harmed BOB and concluded: "I have considered various alternative causes to the degree needed for me to render reliably the opinions I express in this report." JA376-77 ¶¶ 18, 21; *see also* JA252:1-JA256:14.[15] As Defendants' expert explained, though, there is no reason to credit this conclusion because numerous other factors appeared to harm BOB's business. *See*, *e.g.*, JA294-97 ¶¶ 19-26;

---

[15] Ratliff also argues that no other causes for BOB's failure coincide with the downturn in BOB's revenues. JA432-33 ¶ 8; JA464-65 ¶ 161-164. But, as fully explained above, BOB's revenue decline coincided with a number of factors unrelated to agency pricing, including the product outage. Further, Ratliff's analysis does not excuse his failure to analyze the effects of alternative causes on BOB's business.

JA310-11 ¶ 52.  BOB's damages expert[16] likewise failed to disaggregate harm

attributable to factors other than the alleged conspiracy.  JA275:16-20; *see also*

JA270:4-JA275:20.[17]

The Supreme Court "has repeatedly held that in the absence of more precise

proof, the factfinder may 'conclude as a matter of just and reasonable inference …

from the evidence of the decline in prices, profits and values, ***not shown to be***

***attributable to other causes***, that defendants' wrongful acts had caused damage to

the plaintiffs.'" *Zenith Radio,* 395 U.S. at 123-24 (*quoting Bigelow v. RKO Radio*

*Pictures, Inc.*, 327 U.S. 251, 264 (1946)) (emphasis added); *see also United Mag.*

*Co.*, 393 F. Supp. 2d at 212-13 (granting summary judgment where "plaintiffs have

failed to account for these other causes" of its alleged injury); *Intimate Bookshop v.*

*Barnes & Noble, Inc.*, No. 98 Civ. 5564 (WHP), 2003 WL 22251312, at \*7-8

(S.D.N.Y. Sep. 30, 2003) ("[Plaintiff's] unsupported assumption of causation and

supposition that all of its losses were caused by defendants' allegedly unlawful

conduct, and failure to account for defendants' lawful conduct and intervening

---

[16] BOB's damages expert, Karl Schulze, is the same expert whose report the Ninth
Circuit found to be inadequate in *Magnetar*.  801 F.3d at 1159-60.

[17] BOB's damages expert also relied on flawed methodologies and assumptions to
determine his valuation of BOB's damages, including assuming that BOB's market
share would remain constant while the e-books market was growing.  As noted
above and shown in Carlton's expert report, BOB's market share was swiftly
eroding in the years prior to agency, as BOB was being squeezed out of the e-
books business.  56.1 Stmt. ¶ 36.

market factors are fatal to its claim.").

BOB cannot survive summary judgment on this record. It has not established that agency pricing was a "substantial or materially contributing factor" in its demise. And given the extensive documentation of alternative problems unrelated to agency pricing facing BOB, both before and after agency, it has neither established that agency pricing was a "but for" cause of its failure, nor provided a basis for disaggregating any effect that agency pricing did have on its business from the many unrelated causes of its failure.

### B.     BOB's Attempts To Explain The Record Do Not Establish A Genuine Dispute

BOB points to a handful of pieces of evidence to argue that it has established a dispute of fact regarding causation, while attempting to explain away the extensive record that contradicts its claims. BOB's evidence—either separately or collectively—is not enough to establish a genuine dispute of a material fact.

### 1.     BOB's Limited Evidence Does Not Establish A Genuine Dispute Of Material Fact

BOB's reliance on an ambiguous statement in one document that "agency pricing is scaring heck out of me," and its claims that it turned to antitrust enforcers after agency was announced cannot establish a genuine dispute of material fact regarding the cause of BOB's failure in light of the "overwhelming" evidence that BOB could not compete on price, that it was not injured by

56

restrictions on price competition, and that its failure was caused by numerous factors other than the agency pricing model.

BOB's reliance on its drop in revenues due to the product outage also cannot establish causation. As discussed above, the outage was separate and distinct from the agency pricing model, and was not "inextricably intertwined"—as LiVolsi himself recognized. BOB's expert's report, which similarly relies heavily on the chart of BOB's revenues, is not sufficient to establish a genuine dispute of material fact because BOB's expert failed to evaluate the ample evidence showing that BOB was not competitive before or after agency, or the evidence of the numerous causes of BOB's failure. Rather, BOB's expert's analysis is similar to that of the expert in *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1276 n. 19 (3d Cir.1995) (reversing judgment of damages), as discussed in *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 247 (3d Cir. 1999). As the *Callahan* court noted, in *Stelwagon*, the expert "failed to discuss certain factors…about which the defendants introduced specific evidence" and thus the Court determined that the expert report was inadequate. *Callahan*, 182 F.3d at 258. BOB's expert likewise wholly failed to consider the many factors in the record, identified by BOB itself in contemporaneous records, which were in part the basis of Publisher Defendants' motion to exclude Ratliff's opinions. D.E. 184 at 12-14. Unlike in *Callahan* or in *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452 (3d Cir. 1998), the record here does

not support Plaintiffs' arguments that there is a genuine dispute as to any material facts. BOB identified many items that deeply affected its business, but never identified the pricing restrictions of the agency model.

### 2. BOB's Explanations For Alternative Causes Do Not Establish A Genuine Dispute Of Material Fact

BOB's explanations for the causes that it had previously identified as contributing to its failure generally fall into one of three categories: (1) The problem did not harm BOB because its CEO testified after-the-fact in connection with this litigation that it did not harm BOB; (2) the problem did not harm BOB because it existed prior to agency when BOB was supposedly successful; or (3) the problem harmed BOB but the impact was not substantial enough to put BOB out of business. Br. 49-59. The first explanation fails because, as noted above, LiVolsi's uncorroborated testimony is insufficient to create a dispute of material fact in the face of contradictory contemporaneous evidence. The second explanation is belied by the evidence showing that BOB's stagnating revenues and sinking market share, and the contemporaneous documents showing that BOB was unable to compete with bigger retailers. *See supra* 13-14. And the third explanation misses the point, and the law; the aggregate of all of the independent causes collectively caused BOB to fail. No one cause had to be the silver bullet.

BOB also introduced testimony suggesting there are disputes of fact regarding the success of its business—e.g., that its e-books could be read on the

Kindle or Nook devices, or that it had 300,000 registered customers.  Br. at 19, 51.

But these points are belied by the contemporaneous evidence.  *Compare* JA1066

(LiVolsi's testimony stating that BOB had over 300,000 registered customers) *with*

JA741 (BOB had "over 100,000 registered customers" as of November 2009); *see*

*also* JA756; JA1502:12-22; JA1693:22-JA1694:16 (users of Kindle e-reader

devices could not read BOB e-books).  And these purported "issues of fact" are

neither genuine nor material.  *See supra* 21-22; *see also* JA1231-86.

The cases BOB cites do not support its argument that the elimination of

price competition was a material cause of BOB's failure.  In *In re Flonase*

*Antitrust Litig.*, the court cited direct evidence accounting for each other

intervening cause, in deciding that there was a material fact dispute as to causation.

798 F. Supp. 2d 619, 630-33 (E.D. Pa. 2011).  In *Discover Fin. Servs. v. Visa*

*U.S.A.*, the court was merely considering whether to exclude an expert's testimony

and did not consider the question of causation.  582 F. Supp. 2d 501, 504-5

(S.D.N.Y. 2008).  Plaintiffs torture the holding in *Litton Sys., Inc. v. Amer. Tel. and*

*Tel. Co.* to argue that BOB "is <u>not</u> required to prove that these other factors did not

cause its injuries."  Br. at 50.  Rather, *Litton* merely affirms that an antitrust

plaintiff must demonstrate that the defendant's conduct was a substantial or

materially contributing factor to its injury, which BOB did not do.  700 F.2d 785,

823 n. 49 (2d Cir. 1983).

BOB also cites a number of cases stating that a defendant's unlawful conduct need not be the sole cause of a plaintiff's injuries. Br. at 58-59. But the district court acknowledged these cases. SPA024. BOB fails, however, to grapple with the fact that, if agency pricing harmed BOB at all, the alternative causes here—which BOB itself identified—overwhelm the adoption of agency pricing as the cause of BOB's failure. Indeed, BOB itself recognized that agency pricing *was not* a cause of its failure. BOB also cites a number of cases that stand for the uncontroversial rule that where a plaintiff establishes sufficient facts to survive summary judgment on causation, it should survive summary judgment. As discussed *supra*, and as recognized by the district court, BOB has not offered evidence to support a genuine dispute as to causation. Rather, the record shows that BOB failed as a result of numerous causes, did not cite the adoption of agency pricing as a cause of its failure, and specifically *excluded* agency pricing as a cause of its failure. As such, it cannot survive summary judgment.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment entered by the district court in all respects.

September 19, 2016                  Respectfully submitted,

*/s/ Yehudah L. Buchweitz*
_____

JAMES W. QUINN
YEHUDAH L. BUCHWEITZ
GREGORY SILBERT
WEIL, GOTSHAL & MANGES LLP
*Attorneys for Defendant-Counter-*
*Claimant-Appellee Simon & Schuster,*
*Inc.*
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

 */s/ Saul P. Morgenstern*

SAUL P. MORGENSTERN
MARGARET A. ROGERS
ALICE C.C. HULING
KAYE SCHOLER LLP
*Attorneys for Defendant-Counter-*
*Claimant-Appellee Penguin Group*
*(USA) LLC*
250 West 55th Street
New York, New York, 10019
(212) 836-8000

 */s/ Joel M. Mitnick*

JOEL M. MITNICK
JOHN J. LAVELLE
BIANCA CADENA
SIDLEY AUSTIN LLP
787 7th Avenue
New York, NY 10019
(212) 839-5300
*Attorneys for Defendant-Appellees*
*Holtzbrinck Publishers, LLC, DBA*
*Macmillan and Verlagsgruppe Georg*
*Von Holtzbrinck GMBH*

 */s/ C. Scott Lent*

C. SCOTT LENT
ARNOLD & PORTER LLP
*Attorney for Defendant-Appellee*
*HarperCollins Publishers L.L.C.*
399 Park Avenue
New York, NY 10022
(212) 715-1000

 */s/ Linda H. Martin*

LINDA H. MARTIN
SAMUEL J. RUBIN
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
31st Floor
601 Lexington Avenue
New York, NY 10022
(212) 277-4000
*Attorneys for Defendant-Appellee*
*Hachette Book Group, Inc.*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)**

I hereby certify pursuant to Fed. R. App. P. 32(a)(7)(C) that the attached

brief is proportionally spaced, has a typeface (New Times Roman) of 14 points,

and contains 13,995 words (excluding, as permitted by Fed. R. App. P.

32(a)(7)(B), the corporate disclosure statement, table of contents, table of

authorities, and certificate of compliance), as counted by the Microsoft Word

processing system used to produce this brief.


Dated: September 19, 2016                           _/s/ Yehudah L. Buchweitz_

                                                    Yehudah L. Buchweitz